## MEAD *against* JOHNSON.

## JOHNSON *against* MEAD.

In *November*, 1804, *A.* agreed with *B.* to sell him an undivided moiety of a lot of land, for which *B.* agreed to pay 1500 dollars within three months after the removal of a certain incumbrance upon it, to be purchased in, by the parties, at their joint expence ; when *A.* was to give a deed of it, with warranty. The incumbrance was accordingly purchased in, and a deed taken to *B.* alone ; and *B* paid the purchase money ; after which, *viz.* in *September*, 1809, the agreement was cancelled, without *A.*'s having given any covenant to secure the title, under a belief, by both parties, that the title was already well vested in *B.* In 1819, *B.* discovering that he had acquired no title, brought a bill against *A.*, for the reimbursement of the purchase money ; during the pendency of which, *A.* procured a title to himself, and offered to convey it, by a release deed, to *B.* This *B.* refused to accept ; there being no warranty, and the lapse of time having depreciated the value of the land.

Held, 1. That the title of *B.*, in consideration of which he paid the money, having failed, he was entitled to adequate redress ; 2. That as the mistake was mutual, and without fraud, the tender of a deed conveying to *B.* a good title, constituted such redress ; 3. That the stipulation for a warranty having been voluntarily relinquished, when the agreement was cancelled, under no mistake, except as to title, it was sufficient to make the title good, without warranty ; and, 4. That the time elapsed, together with a depreciation in the value of the land, furnished no reason for *B.*'s refusing the title offered, and claiming a reimbursement of the purchase money.

*Fairfield,*
June,
1821.

Mead
*v.*
Johnson.

ON the 13th of *November*, 1804, *Mead* and *Johnson* entered into the following articles of agreement : " That the said *Johnson* doth agree to sell to the said *Mead*, the one full undivided moiety, or half part, of a tract of land, situate in the *Minisink* patent, in the state of *New-York*, being known and called *Lot No. 5.* in the first division of said patent, and containing in the whole, by survey, 1674 acres, for the sum of 1500 dollars, with interest at the rate of 6 *per cent.* from the 1st day of *November*, 1804, until paid : and said *Mead* doth agree to purchase of said *Johnson* the said half part of said tract of land, containing 837 acres, and to pay him therefor the sum of 1500 dollars, with interest at 6 *per cent.* from said 1st day of *November*, 1804, until paid, and to be paid within three months after the present incumbrance of a mortgage by *Joseph* and *Job Smith*, to *Ann Lyng*, shall be removed ; and said *Johnson* shall deliver to said *Mead* a good warrantee deed of said land.   And whereas a suit is now depending in the court of chancery for the state of *New-York*, in favour of *John K. Beekman*, executor of *James I. Beekman*, against *John, Joseph*, and *Job Smith*, praying that said mortgage may be foreclosed, and the land contained in said mortgage may, by a decree of chancery, be sold, for the payment of the sum of 450*l.*, *New-York* currency, together with the interest thereon, from the 1st day of *November*, 1795, being the sum for which said *Beekman* claims as the assignee of *Ann Lyng* : and whereas said *Beekman* is the only proprietor of two lots of land described in said mortgage, *viz.* lot No. 9. in the first division, and lot No. 23. in the seventh division of said *Minisink* patent ; and the other tracts of land held by said mortgage, are amply sufficient to pay and satisfy the amount of the money due by said mortgage, exclusive of the lot or tract owned by the said *Johnson* and *Mead, viz.* lot No. 5. in the first division : Now, the said *Johnson* and *Mead*, do hereby mutually agree each

*Fairfield,*
*June,*
*1821.*

Mead
*v.*
Johnson.

with the other, that they will, at their joint and equal expence, raise the amount of the money due by said mortgage ; and will, for their joint benefit and advantage, tender the said sum to said *Beekman*, in said court of chancery, or otherwise, as may appear advisable ; or will obtain from said *John K. Beekman* an amicable agreement, that said mortgage shall be foreclosed, and the land therein described sold, under a decree in chancery, to confirm their title, and bought in for the mutual benefit of the proprietors, so as that said *Beekman* may retain his title to the lots belonging to him, *viz.* lot No. 9. in the first division, and lot No. 23. in the seventh division of said patent ; and that said *Johnson* and *Mead* may, upon paying the amount of said mortgage money to said *Beekman*, obtain the title to the other lots of land, described in the said mortgage. And said *Johnson* and *Mead* further agree, that when the title to said lots of land, shall be obtained, and vested in them, or either of them, the same shall be held, managed, or disposed of, as they may agree, for the joint benefit of both parties. In witness whereof, the parties have hereunto set their hands and seals.

[Signed]                           *Samuel W. Johnson,* [*L. S.*]
                                    *Richard Mead.* [*L. S.*]"

*Joseph* and *Job Smith* had, on the 5th of *November*, 1795, duly executed to *Ann Lyng*, the mortgage deed mentioned in the above-recited covenant ; conveying to her and her heirs lots No. 20. and 27. in the second division, and lot No. 9. and said lot No. 5. in the first division, and lots No. 23. and 36. in the seventh division in the *Minisink* patent ; and conditioned for the payment of 450*l*. *New-York* currency, on or before the 1st of *November*, 1799. In this deed, *Joseph* and *Job Smith* covenanted with *Ann Lyng*, " that, in case the said sum of 450*l*., with the interest thereon to become due, or any part thereof, should become due, and remain unpaid, it should be lawful for the said *Ann Lyng*, her heirs or assigns, at any time after the 1st day of *November*, to grant, sell, and dispose of the premises, or any part thereof, at public vendue, or otherwise, as to her should seem meet, to any person or persons, and for such sum of money as might be reasonably had for the same, and out thereof to retain in her hands the said sum of 450*l*. and the interest that might be due thereon, together with the costs and charges of such sale ; rendering the overplus, if there should be any, to the said *Joseph* and *Job Smith*." *Mead*

had received from *Stephen Davis* and *Bethia*, his wife, a deed of the other moiety of said lot No. 5., duly executed, and delivered, on the 3rd of *June*, 1800 ; and, at the time of making said agreement with *Johnson*, *Mead* verily believed, that by virtue of the last-mentioned deed, he became vested in fee-simple with the moiety therein described, subject only to the incumbrance of the aforesaid mortgage, in common with the other lands in that mortgage mentioned.   Previous to the discharge of the articles of agreement, the right and title of *Joseph* and *Job Smith* were, by a decree of the court of chancery in the state of *New-York*, and by a sale of lands pursuant to such decree, and in conformity to the provisions of the mortgage deed, extinguished.   *Mead* paid the purchase money to *Johnson*, partly in cash, and partly by advancements for purchasing up said mortgage ; the assignment of which he took to himself solely ; the parties, at the time of such payment, believing, that the title to a moiety of lot No. 5. had become vested in *Mead*.   On the 21st of *September*, 1809, the articles of agreement, under a belief by both parties, that a good indefeasible estate in fee-simple was well vested in *Mead*, were cancelled, and delivered up to *Johnson*, without his having entered into any covenant with *Mead*, to secure to him the title.   *Ann Lyng* died, many years before the articles were entered into ; having never had any other interest in lot No. 5. than a life estate.   *Joseph* and *Job Smith* had no interest in it, after her death ; and *Mead* never acquired any title to, or right or interest in it ; but it belonged in fee to the grand-children of *Harman Lyng*, and heirs of *John Burt Lyng*.   In *September*, 1819, *Mead* brought his bill in chancery, against *Johnson*, to recover the purchase money paid for it.   On the 12th of *September*, 1820, pending *Mead's* bill, *Johnson* procured from these heirs, for the consideration of 250 dollars, a deed of release, executed according to the laws of the state of *New-York*, conveying to him lot No. 5. in fee ; and on the 21st of the same *September*, made and offered to *Mead*, a like deed, vesting the title thereof in him ; which he refused to accept. At the time of this tender, lot No. 5., by reason of the fall of the price of lands, was of much less value, than when the articles were entered into, and when they were cancelled.

*Johnson* instituted his cross-bill, to compel *Mead* to accept the deed, and praying that all proceedings in law, and in equity, might be stayed.

*Fairfield,*
*June,*
1821.

Mead
*v.*
Johnson.

*Fairfield,*
*June,*
*1821.*

*Mead*
*v.*
*Johnson.*

*Sherman* and *Wood*, for *Mead*, contended, That the agreement having been entered into, and the money paid, under a mutual mistake, and the agreement cancelled, under the same mistake, equity requires, that the agreement should be rescinded, and the money refunded. *Briggs'* case, *Palm.* 364., *Chambers* v. *Griffiths*, 1 *Esp. Rep.* 150., *Johnson* v. *Johnson*, 3 *Bos. & Pull.* 162., *Farrer* v. *Nightingale*, 2 *Esp. Rep.* 639., *Sanford* v. *Dodd*, 2 *Day* 337., 1 *Pow. Contr.* 196., *Newl. Contr.* 432., 1 *Madd. Chan.* 62., 1 *Fonb.* 108., *Reeve's Dom. Rel.* 424. The general principle will not be controverted. But it will be said, that where the parties acquiesce, for a long time, under a mistake, chancery will not relieve. To subject a case, however, to the operation of this rule, the parties must have acquiesced, after having *found out* the mistake. *Bingham* v. *Bingham*, 1 *Ves.* 126., *Nichols* v. *Leeson*, 3 *Atk.* 573., *Pooley* v. *Ray*, 1 *P. Wms.* 354., 1 *Madd. Chan.* 62, 3. In this case, the parties have not acquiesced, after discovering the mistake ; for, soon after the discovery, *Mead* applied to *Johnson* for relief.

If an instrument be given up, by mistake, and through ignorance of a state of facts, which would have rendered it conscientious to hold such instrument, a court of equity will relieve. *East-India Company* v. *Donald*, 9 *Ves.* jun. 275., *East-India Company* v. *Neave*, 5 *Ves.* jun. 173., 1 *Madd. Chan.* 64.

*Johnson* cannot prevail on his cross-bill, for a specific performance. First, because *Mead* will not be put in as good a condition, by accepting the deed offered, as he would have been, if the agreement had been performed at the time stipulated. If *Johnson* had conveyed the land, at the time agreed upon, *Mead* would have had land worth 1500 dollars ; but now, it is worth not an eighth part of that sum. Secondly, the length of time elapsed, is, of itself, an objection to a specific performance. This is always fatal, where a material disadvantage has resulted from it. 1 *Madd. Chan.* 329. Thirdly, the deed now offered, is not such a deed as the terms of the agreement require. That was a deed of warranty ; this is a release only. By the agreement, *Mead* is not only entitled to a good title, so far as now appears, but to a guaranty against all unknown or possible defects.

*Daggett* and *Sherwood*, for *Johnson*, after remarking, that *Mead* had charged no fraud, either by misrepresentation or

concealment, but proceeded in his bill wholly on the ground, that the contracting parties were ignorant of the title, they supposing it to have been in *Ann Lyng*, when in fact she never had more than a life-estate in it, and she being dead in 1804, when the agreement was entered into, the title was in the heirs of *John B. Lyng*,—contended, 1. That *Mead* could take nothing by his bill ; for that upon the facts stated and found, he is not entitled to any relief, having voluntarily relinquished all claim on the agreement. *Pollard* v. *Lyman*, 1 *Day*, 156., 1 *Pow. Contr.* 141., 2 *Bro. Chan. Rep.* 420.

2. That however this may be, still, the court ought, upon *Johnson's* bill, to afford relief against *Mead's* claim, by decreeing a specific performance of the agreement. *Newl. Cont.* 213. & seq. 227. & seq., 1 *Madd. Chan.* 349., *Langford* v. *Pitt*, 2 *P. Wms.* 630., *Joynes* v. *Statham*, 3 *Atk.* 388.

HOSMER, Ch. J. There is no pretence, that, in the contract between the parties, or any proceeding under it, fraud has been committed ; but, on the contrary, the conduct of both has been fair and honourable.

It was the mutual understanding, that *Mead* should be invested with a title in the land, embraced by the covenant. By both it was believed, that a valid title had been acquired ; nor was the contrary known, until after the lapse of a number of years. The failure of consideration is admitted ; and a restitution of the money paid for the land, is now demanded.

It is said to be extremely difficult, if not impracticable, to extract from the books, what the rule of equity is, on this point. 1 *Fonb.* 363. On principles of natural justice, it is clear, that an error in that particular, in prospect of which a man is induced to come to an agreement, and which constituted the material motive to his assent, should invalidate the contract. *Puff. L. N. lib.* 1. *c.* 3. *ff.* 12., *Poth.* 14. 15. And the civil law seems, on this foundation, to have required the seller, in some cases, to declare the defects of the thing sold. *Dig. lib.* 21. *tit.* 1. *ff.* 1., *Domat, lib.* 1. *tit.* 2. *ff.* 11. It was determined, by Lord *Nottingham*, (*Anon.* 2. *Ch. Ca.* 19.,) that the evicted purchaser is relievable from the payment of the purchase money ; and in *Bumpus* v. *Platner* & al. 1 *Johns. Chan. Rep.* 213., an eviction at law was considered, as an indispensible part of the plaintiff's claim to relief in chancery, on the mere ground of failure of consideration. For the distinction

*Fairfield,*
*June,*
*1821.*

Mead
*v.*
Johnson.

between failure of title, proved by eviction, under a better title, and without this accompaniment, I take the reason to be, that, in the former case, the want of consideration, is indisputably established ; and that, in the latter, it is not, and cannot be tried in chancery on bill. Waiving a discussion of the point as unnecessary, it is observable, in this case, that the defect of title is admitted by the parties ; and, therefore, that it rests, substantially, on the same ground, as if there had been an eviction. On the part of *Mead,* I can discern no neglect or acquiescence, that should seclude him from relief ; and the injustice of his remaining unredressed, in some proper manner, is too palpable to be questioned.

The enquiry, then, remains, what remedy is adequate to the plaintiff's case ; and, the general answer is, that which will do equal justice to the parties. The mistake was mutual, uncontaminated with fraud ; and all that justice requires, is, that *Mead* should be placed in a condition equally beneficial, as if no mistake had intervened. As soon as was convenient, after notice of the failure of consideration, *Johnson* acquired a good title to the premises, from the grand-children of *Harman Lyng,* " who," as *Mead* avers in his bill, were " solely and exclusively entitled thereto in fee simple." This title *Johnson* offers to convey to *Mead,* by deed of release ; and to this several objections have been made.

1. It is said, that the conveyance should be by deed, with covenants of warranty. Had the covenant between the parties remained in full force, the objection would be well founded ; but satisfied with the title acquired, it was voluntarily surrendered and annulled. In doing this, there undoubtedly was a mistake ; but that respected the title only, and not the relinquishment of the warranty. The transaction, necessarily, involved this understanding, that the title being good, as it was supposed to be, the deed with warranty was not to be exacted. After this, it never can be required, on any just principle, that there should be a retrospect, placing *Mead* on higher ground, than that which he had voluntarily, and without mistake, abandoned. The covenant having been annulled, on the principle, that there was a good title, and the warranty dispensed with, the case ought to be viewed, as if the contract were merely to give a good and sufficient deed. A contract of this description is performed, if a deed without warranty, competent to pass the title, is delivered. *Van Eps* v. *Schenec-*

*tady*, 12 *Johns. Rep.* 436. 442., *Gazley* v. *Price*, 16 *Johns. Rep.* 267.

2. It has been insisted, that on the part of *Johnson*, there has been unjustifiable neglect ; but the facts do not warrant this assertion.   He believed, in 1809, when the covenant was annulled, that *Mead* was invested with a good title to the premises ; and from that moment, he was under no conceivable obligation, to make further enquiry into the subject.   So soon as the defect of title was made known to him, he hastened to repair it ; and now offers to give a title, found to be unquestionable, and entirely unquestioned by the plaintiff.

3. It is further contended, that the length of time elapsed, is a fatal objection to a specific performance ; and particularly, as material disadvantage has been incurred by its lapse. It is not a fact, that any damage has resulted, from the want of precise performance.   The value of the contract has not been impaired, by any omission on the part of *Johnson*, but by the accidental consequence of that general depreciation of property in the market, which resulted from public causes, operating throughout the country.   It is not averred, by *Mead*, that he has been obstructed in the possession, improvement, or disposal of the land purchased, or embarrassed in any of his proceedings.   The same depreciation of property complained of, would have equally existed, if the title had been unquestionable ;   and it is as unfounded to say, that *Johnson* was under an obligation to sustain this accidental loss, as that he was invested with a right to demand a portion of any appreciation, which might arise.   Independent of circumstances materially affecting the benefit of the contract, for which he ought to be responsible, and none such exist, the lapse of time would constitute no objection to a specific performance, if the land has been in the occupancy, or under the controul, of *Mead*.   But this is not the correct light, in which the subject should be viewed.   *Mead* has exhibited his bill to obtain restitution of the money paid by him ; and *Johnson*, throughout, is essentially in the character of a defendant, repelling the plaintiff's claim.   *Johnson*, without delay, has promptly offered to convey a good title to the premises, which, at some expence, he has procured ; and this being done, the only complaint of *Mead* is annihilated.   This is a remedy appropriate to the case, founded in the most exact justice, and conferring on *Mead* all the benefit, which the equity of the case demands.

Fairfield,
June,
1821.

Mead
v.
Johnson.

I would, therefore, advise, that the bill of *Mead* be negativ-ed ; and the cross-bill of *Johnson*, granted ; and on his depo-siting the deed of release, executed by himself and wife, with the clerk of the superior court, for the use of *Mead*, that *Mead* be enjoined against any further proceedings at law, or in equi-ty ; and that no costs be taxed for either party.

The other Judges were of the same opinion, except BRIS-TOL, J. who, being related to one of the parties, gave no opinion.